UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHELLE ROMAN an individual,<br><br>Plaintiff,<br><br>v.<br><br>HERTZ LOCAL EDITION CORP., and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.:  20cv2462-BEN (AGS)<br><br>**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>**[ECF No. 17]** |

## I. INTRODUCTION

This case arises out of a lawsuit filed by Plaintiff Michelle Roman against her former employer Defendant Hertz Local Edition after the company terminated Roman's employment.  Roman alleges disability discrimination based on an actual and/or perceived disability, wrongful termination in violation of public policy, failure to provide reasonable accommodation, failure to engage in the interactive process, and failure to timely pay wages.

The matter comes before the Court on Defendant's Motion for Summary Judgment.  The Court grants summary judgment on all claims.

## II. BACKGROUND

Roman claims her job should have been protected while she suffered from

COVID-19 under California's Fair Employment and Housing Act ("FEHA") because she was disabled or regarded as disabled. Her job was not protected. Hertz decided that she had come to work feeling ill in violation of company rules. For that reason, Hertz terminated her employment.

Roman began working for Hertz in 2018. Pl.'s Dep. 65:6-66:22. By 2020, she had been promoted to the position of management associate at the National City, California branch. *Id.* at 68:5-13. During 2020, Roman and other employees rotated responsibility for conducting COVID-targeted screenings for employees entering the workplace. *Id.* at 82:3-25. To perform these screenings, Roman and other employees received training on COVID-safe policies and how to screen employees for COVID-related symptoms. *Id.* at 81:1-82:25. She understood that it was her responsibility "to know and adhere to the protocols," one of which was that "employees showing . . . recognized indications of COVID-19 not be admitted to company facilities." *Id.* at 81:18-23, 83:7-12; 85:25-86:4, Pl.'s Dep. Ex. 9. Recognized indications of COVID-19 included "feeling unwell and experiencing cough or shortness of breath." Pl.'s Dep. 85:15-19; Pl.'s Dep. Ex. 9 and 10. An employee who was sent home because of answering "yes" to any of the screening questions could return to work after seven days of the symptoms first appearing if the employee was "symptom free of fever" and free of "any respiratory illness (cough, shortness of breath)." Pl.'s Dep. Ex. 10. Alternatively, an employee could return to work upon proof of a negative COVID-19 test result. *Id.*

On September 1, 2020, Roman woke up feeling fine, but tired. Pl.'s Dep. 89:25-90:3. Roman reported to work. That afternoon she began experiencing "super mild body aches" and she felt "super tired" by the time she left. Pl.'s Dep. 93:3-13, 96:10-25. After work, her symptoms worsened as she felt "more tired than before" and upon arriving home felt "dead." *Id.* at 97:3-7. She also suffered that night from a headache "so much worse [than usual]." *Id.* at 93:24-25. However, she attributed these symptoms to her busy work schedule and strenuous workouts, so she was convinced that she did not have COVID-19. *Id.* at 94:1-17. Nevertheless, because she did not want to expose her parents

to the virus, she scheduled a COVID-19 test for the next day, September 2nd. *Id.* at 95:9-23. She did not report her body aches to anyone at work because they were "super mild." *Id.* at 97:1-3.

When Roman woke up on September 2nd, she felt the same fatigue and still "a little bit sore," but still attributed these aches to her rowing exercise. Pl.'s Dep. 98:11-99:14. When she went to work, a colleague performed the COVID-19 screening test and took her temperature. Her temperature was normal. *Id.* at 102:4-10. Roman underwent a COVID-19 test during lunchtime and returned to work. *Id.* at 103:19-20, 104:11-13. Despite still feeling tired and suffering from pain in her hips and back that was "killing [her]," she worked her normal hours. *Id.* at 104:11-21. Later that night she texted her supervisor, Leonardo Garcia, that she had been feeling bad for two days, specifically noting she had cold symptoms with a cough. *Id*. at 107:11-108:11; Pl.'s Dep. Ex. 12. Roman maintains that the cough to which she referred in the text began that same night. Pl.'s Dep. 107:11-108:11. She also notified him that she took a COVID-19 test earlier that day because she was feeling sick. Pl.'s Dep. 112:12-20; Pl.'s Dep. Ex. 12.

The following day, September 3rd, Roman took the day off from work because she was not feeling well and feared the cold environment of the office could make her symptoms worse. She did not believe that her symptoms were bad enough to be caused by COVID-19. Pl.'s Dep. 113:21-114:25.

When Roman woke on September 4th, she felt better but still had a headache. *Id*. at 125:12-20. She says she "probably" was still experiencing her other symptoms. *Id.* at 126:4-23. Roman recalls that Garcia told her, through a text message, to come to work while she was awaiting the results of her COVID-19 test, because they were busy. *Id.* at 121:21-122:8; Opp'n 1:15-16. September 4th was the start of the Labor Day holiday weekend that year. However, this text message was not among the phone records produced in discovery by Roman and she said that she could not remember specifically receiving this text message or the details of the text message. Pl.'s Dep. 122:6-123:16. Hertz maintains that no such communication occurred because she offered no evidence

and failed to provide details of the text exchange during her deposition. Def.'s Opp'n at 3:21-4:3.

About 10:00 a.m. that day, Roman received a positive result from the COVID-19 test. Pl.'s Dep. 132:3-133:15; Pl.'s Dep. Ex. 13. She communicated the positive test result to Garcia. Pl.'s Dep. 132:16-21. Garcia, in turn, communicated the positive test result to Ashleigh Chavez. Chavez worked in Hertz' human resources office. Chavez Decl. ¶ 3. Garcia told Roman to go home, which she did. Pl.'s Dep. 136:5-17. From the day she went home until September 18th, Roman quarantined and did not work. *Id.* at 149:12-150:6.

Garcia told Roman that, because she tested positive for COVID-19 and therefore was not allowed to work, she would receive 80 hours of COVID-19 pay in accordance with Hertz's policies. *Id.* at 163:8-165:5. Roman underwent another COVID-19 test on September 16th and received a negative result from that test on September 18th. *Id.* at 159:2-160:5; Pl.'s Dep. Ex. 15. She communicated the negative test result to Ms. Linden, the general manager at her location. Pl.'s Dep.160:6-17. However, she was not allowed to return to work after submitting her negative COVID-19 test. Oppo. 5:18-20. Roman was not allowed to return to work because Chavez concluded that Roman:

> "violated [Hertz's] COVID protocols and policies by: (1) coming to work on Tuesday, September 1st, despite feeling sick, achy and tired; (2) returning to work on Wednesday, September 2nd, despite scheduling a COVID-19 test for herself; (3) coming back to work on September 2 after taking a COVID-19 test and (4) returning to work on Friday, September 4th, while still waiting to receive the results of her COVID test."

Chavez Decl. 2:4-21. On either September 28th or September 29th, Chavez and Linden held a three-way telephone call with Roman to notify her that she was being terminated because she had violated these rules and policies. Pl.'s Dep. 170:3-171:1; Chavez Decl. 2:20-24.

Roman says that she and Chavez did not know each other very well. *Id.* at 195:12-196:1. Roman concedes that she does not have any reason to believe that Chavez wanted

4

to cause her injury or harm. *Id.* at 196:2-5. Perhaps more importantly, Roman never heard Chavez or Linden make any disparaging or offensive comments about her COVID-19 infection or her positive test results. *Id.* at 197:9-24. Roman does not offer direct evidence that her employment was terminated because she complained about something, but rather believes that she was terminated for some reason related to her complaining, but does not know for sure. *Id.* at 206:6-207:3. She offers no evidence showing that her employment was terminated because she made a complaint. *Id.*

Hertz points out that Chavez submitted requests for COVID-19 quarantine pay for Roman, Garcia, and four other employees who had "possible contact with [Roman] during the week leading up to her positive result." Chavez. Decl. 3:5-8. One of the four employees who had possible contact with Roman also reported a positive COVID-19 test. *Id.* at 3:9-10. None of these four employees suffered adverse employment action and all returned to work at the end of their paid quarantine leaves. *Id.* at 3:11-13. Previous to this incident, Ms. Chavez had also approved COVID-19 quarantine pay and leave for four other employees, none of whom were terminated by Hertz. *Id.* at 3:14-16.

### III. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence, viewed in the light most favorable to the non-moving party, "is such that a reasonable jury could return a verdict for the non-moving party." *Id*. To meet this standard, the party seeking to defeat summary judgment must come forward with affirmative evidence from which a reasonable jury could render a verdict in that party's favor. *Id*. at 252. However, the nonmoving party's mere allegation that factual disputes exist between the parties will not defeat an otherwise properly supported motion for summary judgment. *See* Fed. R. Civ. P. 56(c); *see also Phytelligence, Inc. v. Washington*

*State Univ.*, 973 F.3d 1354, 1364 (Fed. Cir. 2020) ("Mere allegation and speculation do not create a factual dispute for purposes of summary judgment.") (quoting *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996)).  Additionally, while the Court will believe the evidence of the non-moving party, and draw all reasonable inferences in the non-moving party's favor, the Court will not believe evidence that does not exist or draw unreasonable inferences. *Cf. Anderson*, 477 U.S. at 255.

## IV. DISCUSSION

### A. Disability under FEHA

The basis for most of Roman's claims is that because she became infected with COVID-19 she suffered from a disability (or alternatively was *perceived* as suffering from a disability).  Because she suffered from a disability, she was entitled to protection against discriminatory and adverse actions under FEHA.  Pl.'s Opp'n, 6:20.  Whether contracting COVID-19 qualifies as a disability under FEHA is a question of first impression.

FEHA defines a physical disability as a physiological condition that affects one or more body systems.  Cal. Govt. Code § 12926(m)(1)(A).  The disability must also limit a major life activity.  *Id.* § 12926(m)(2)(B).  A condition limits a major life activity if it makes the achievement of the major life activity difficult.  *Id.* § 12926(j)(1)(B), (m)(1)(B)(ii).  On the other hand, a disability is not a condition that is mild or does not limit a major life activity.  2 Cal. Code Regs. § 11065(d)(9)(B).  For example, California regulations expressly exclude non-migraine headaches.  *Id.*  "These excluded conditions have little or no residual effects, such as the common cold; seasonal or common influenza." *Id.*  A condition need not be permanent to qualify as a disability.  Even short term conditions, if they limit a major life activity, may qualify for protection.  *Diaz v. Federal Express Corp.*, 373 F. Supp. 2d 1034, 1051-53 (C.D. Cal. 2005).  Whether an ailment qualifies as a disability is evaluated on a case-by-case basis.

If one has a disability, FEHA prohibits employers from firing or discriminating against an employee in "compensation or in terms, conditions, or privileges of

employment" because of the disability. Cal. Gov. Code § 12940(a). Under FEHA, "being regarded . . . as having" a disability is treated the same as actually having the disability. Cal. Gov. Code § 12926(m), (m)(B)(ii), (m)(4). FEHA instructs courts to construe its protections broadly. However, theoretical arguments to broaden the scope of FEHA or to narrow its exceptions do not necessarily lead to the conclusion that the statute is legitimately susceptible of that interpretation. *Kelly v. Methodist Hospital of So. California*, 22 Cal. 4th 1108, 1114 (2000).

### 1. **Whether Roman Suffered from a Disability Due to Her COVID-19 Infection**

As a threshold matter, Hertz argues Roman did not suffer from a FEHA-recognized disability. Def.'s Mot. Summ. J. 7:20-21. Specifically, Hertz contends that Roman's COVID-19 infection falls under Cal. Code Regs. tit. 2, § 11065(d)(9)(B), which excludes certain conditions from FEHA's definition of disability. *Id.* at 9:13-11:21. Roman disagrees, claiming that her infection, although temporary, qualified as a disability. Opp'n. at 6:24-25. Roman argues that a COVID-19 infection does not fall under the exclusion in Cal. Code. Regs. tit. 2, § 11065(d)(9)(B) because she was not allowed to work or engage in any social activities due to her malaise and subsequently due to her positive test. *See id*. at 7:4-6. Alternatively, Roman asserts that the question regarding whether she had a disability is to be determined by the trier of fact, not by the court at the summary judgment stage. *Id*. at 7:6-7.

A federal court exercising diversity jurisdiction applies the law of the state in which it sits. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986). In so doing, a federal court will follow a state supreme court's interpretation of a state statute. *Knapp v. Cardwell*, 667 F.2d 1253, 1260 (9th Cir.), *cert. denied*, 459 U.S. 1055 (1982). However, the California Supreme Court has not determined whether FEHA covers a COVID-19 infection. Where the state's highest court has not decided an issue, the task of a federal court is to predict how the state high court would resolve it. *Fiorito Brothers, Inc. v. Fruehauf Corp.*, 747 F.2d 1309, 1314 (9th Cir. 1984). In answering that question,

a federal court looks for guidance from decisions by intermediate appellate courts of the state and by courts in other jurisdictions. *Lewis v. Anderson*, 615 F.2d 778, 781 (9th Cir. 1979), *cert. denied*, 449 U.S. 869 (1980); *Takahashi v. Loomis Armored Car Service*, 625 F.2d 314, 316 (9th Cir. 1980) (federal court may look to well-reasoned decisions from other jurisdictions); *American Sheet Metal v. Em-Kay Engineerinq Co.*, 478 F. Supp. 809, 813 (E.D. Cal. 1979) (decisions by California Courts of Appeal may be persuasive). Unfortunately, the California courts of appeal have yet to address whether a COVID-19 infection is a disability under FEHA.

### a. FEHA's Disability Regulations

Without guidance from the California courts, this Court looks to regulations issued by the California Department of Fair Employment and Housing ("DFEH"). Because the DFEH administers FEHA, *see* Cal. Gov. Code § 12935, its regulations are presumptively valid and binding under state law (provided that they are consistent with the statute and are not arbitrary or capricious). *See Tomlinson v. Qualcomm*, 97 Cal. App. 4th 934, 940 (2002). Under state law, the regulations bind state courts as firmly as the statute itself. *American Nurses Assn. v. Toralkson*, 57 Cal. 4th 570, 588 (2013).

According to Cal. Code Regs. tit. 2, § 11065(d)(2)(C), FEHA's definition of physical disability is to be construed broadly, and includes deafness, blindness, cerebral palsy, and chronic or episodic conditions such as HIV/AIDs, hepatitis, epilepsy, seizure disorder, diabetes, multiple sclerosis, and heart and circulatory disease. The list of specific examples is not particularly helpful, however, as it does not specifically mention COVID-19 and it addresses mostly chronic and long-term conditions that are remarkably unlike Roman's infection.

More helpful is Cal. Code Regs. tit. 2, § 11065(d)(9)(B). This part of the regulation excludes from the definition of a FEHA disability those "conditions that are mild, which do not limit a major life activity, as determined on a case-by-case basis." The regulation then defines a mild condition and gives examples. The regulation says, "mild conditions" are ones which have "little or no residual effects." It lists "the

common cold . . . seasonal or common influenza . . . muscle aches, soreness . . . [and] non-migraine headaches" as specific examples of ailments that do not qualify as a disability under FEHA. *Id*.

When it presents with temporary symptoms akin to the common cold or seasonal flu, COVID-19 will fall outside the FEHA definition of ailments considered a disability, pursuant to § 11065(d)(9)(B). Because the facts on summary judgment about Roman's COVID-19 infection are not genuinely disputed, and because the symptoms of her infection were mild with little or no residual effects, Roman's COVID-19 infection is excluded from FEHA's definition of disability.

Some people who contract COVID-19 experience mild symptoms and can recover at home within a matter of weeks[1], similar to the seasonal flu[2] or cold,[3] which are the only two respiratory illnesses expressly excluded from the definition of disability by the regulation. *See id*. Some COVID-19 infections share the specific symptoms of the common cold and seasonal influenza.[4] In fact, on some occasions COVID-19 is so

---

[1] *What to Do If You Are Sick*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html/ (last updated Mar. 22, 2022).

[2] Most Flu infections are mild and do not require medical care. *Sick with Flu? Know What to Do!*, Centers for Disease Control and Prevention, https://www.cdc.gov/flu/resource-center/freeresources/graphics/sick-with-flu-infographic.html/ (last reviewed March 13, 2018). Also, most people who become infected with the flu recover between a few days to less than 2 weeks. *Flu Symptoms & Complications*, Centers for Disease Control and Prevention, https://www.cdc.gov/flu/symptoms/symptoms/html/ (last reviewed Sept. 21, 2021).

[3] Most people recover from the common cold within 7-10 days. *Common Colds: Protect Yourself and Others,* Centers for Disease Control and Prevention, https://www.cdc.gov/features/rhinoviruses/index.html/ (last reviewed Nov. 29, 2021).

[4] The flu and COVID-19 are both contagious respiratory illnesses, albeit caused by different viruses, that can produce mild or severe symptoms of fever, chills, cough, shortness of breath or difficulty breathing, fatigue, sore throat, runny or stuffy nose, muscle pain or body aches, headache, vomiting, diarrhea, change in loss or taste of smell (although more common in COVID-19). *Similarities and Differences between Flu and COVID-19,* Centers for Disease Control and Prevention, https://www.cdc.gov/flu/symptoms/flu-vs-COVID19.html/ (last reviewed Jan. 18, 2022). Furthermore, the common cold usually includes sore throat, runny nose, coughing, sneezing, headaches, and body aches, which are all also symptoms of COVID-19. *Common Colds: Protect Yourself and Others*,

similar to these two viral illnesses that the NIH and CDC has published guidance on how to determine whether an illness is COVID-19, the seasonal flu, or a common cold.[5]  The CDC observes that COVID-19 most often causes symptoms that can feel much like a cold or flu.[6]  At the same time, it should not go without saying that for some individuals COVID-19 can cause exceedingly severe, even deadly, symptoms with long durations that would easily qualify as a FEHA disability.

      As to Roman, the undisputed evidence is that her symptoms met the regulation's definition of "mild."  *See id*.  Roman's fatigue and body aches were minor enough for the first two days to convince her that they could have been the result of her exercise performing back rows or her busy schedule at work.  Pl.'s Dep. 94:1-17, 96:16-19, 98:24-99:13.  Furthermore, although Roman did experience fatigue, body aches, headache, and cough, these symptoms were mild enough that she was able to work and carry out her duties.  The only day Roman felt sick enough to stay home was on September 3rd.  *See* Pl.'s Dep. 118:6-8.[7]  Even typical symptoms of the common cold, one of the regulation's expressly excluded ailments, temporarily prevent millions of Americans from going to work each year.  In comparison, that Roman felt well enough to work for three days, and only sick enough to stay home one, suggests that her COVID-19 infection was "mild" under this regulation and therefore disqualified from the definition of disabled.  Roman complained of body ache and headache, which the regulation expressly lists as mild

---

Centers for Disease Control and Prevention, https://www.cdc.gov/features/rhinoviruses/index.html/ (last reviewed Nov. 29, 2021).
[5] The NIH published a chart that displays COVID-19, the flu, the common cold, and allergies on a chart, with each of their symptoms and the symptom's frequencies. *Is It Flu, COVID-19, Allergies, or a Cold?*, National Institute of Health (Jan. 2022), https://newsinhealth.nih.gov/2022/01/it-flu-COVID-19-allergies-or-cold/.
[6] *Basics of COVID-19*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-COVID-19/basics-COVID-19.html/ (last updated Nov. 4, 2021).
[7] Plaintiff's own opposition brief agrees that it is undisputed that she felt well enough to work and that she did not believe she had COVID-19 or that anything was wrong other than feeling tired. Oppo. 1:13-15.

conditions with little or no residual effects that do not limit a major life activity. *See* Cal. Code Regs. tit. 2, § 11065(d)(9)(B).

Certainly, COVID-19 is known to produce in some individuals what is termed as "long-haul COVID-19."[8] That type of COVID-19 infection may well fall within FEHA's definition of a disability. Roman does not claim to be suffering from long-term or residual effects. *See generally* Opp'n. In fact, Roman maintains that she did not require further assistance from Hertz beyond the isolation and recuperation period Hertz provided. Pl.'s Dep. 150:7-25.

### b. DFEH's COVID-19 Guidance

Another source to consider in predicting how the California Supreme Court would decide the FEHA disability question is the agency guidance published by the DFEH. This guidance is only persuasive authority for the state's courts, in contrast to binding rules. *See Sara M. v. Superior Court*, 36 Cal. 4th 998, 1012-13 (2005). But it may be helpful. Under state law, the amount of weight given to a non-binding agency interpretation depends on the extent to which "those interpretations are embodied in quasi-legislative regulations or constitute long-standing, consistent, and contemporaneous interpretations," *McHugh v. Protective Life Ins. Co.*, 12 Cal. 5th 213, 227 (2021), the "thoroughness evident in its consideration, [and the] validity of its reasoning." *Yamaha Corp. of Am. v. State Bd. of Equalization*, 19 Cal. 4th 1, 14 (1998) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Published at the onset of the COVID-19 pandemic, the relevant guidance here instructs that "whether illness related to COVID-19 rises to the level of a disability (as opposed to a typical seasonal illness such as the flu) is a fact-based determination." *DFEH Employment Information on COVID-19,* Department of Fair Employment and

---

[8] *See* CDC "Post-COVID Conditions" Sept. 16, 2021, https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects/index.html, noting that some people can experience ongoing health problems related to COVID-19 for four or more weeks after first contracting the virus.

Housing (Feb. 16, 2022), at 6.  Here, the DFEH guidance supports the conclusion that Roman's COVID-19 infection should not be deemed a disability under FEHA.  The guidance would be accorded some weight since its interpretation of disability is essentially that which is embodied in Cal. Code Regs. tit. 2, § 11065(d)(9)(B).  The guidance is helpful in that it contrasts a typical seasonal flu with a more severe protected disability.  *Id*.  Next, because any given COVID-19 infection can range from producing no symptoms to producing symptoms severe enough to cause death, the guidance logically reasons that FEHA requires that COVID-19 infections be analyzed on a fact-based determination to decide whether they qualify as a disability.  *See DFEH Employment Information on COVID-19, supra.  In so doing,* the guidance uses valid reasoning.  *See Yamaha* 19 Cal. 4th at 19.  Given the weight to be accorded the DFEH's interpretation of FEHA's disability provision, the DFEH guidance further persuades the Court that there is no genuine dispute as to whether Roman's COVID-19 infection qualifies as a disability.

### c.  Roman's Other Arguments Also Fail

*Avila* v. *Continental Airlines, Inc.* is instructive.  165 Cal. App. 4th 1237 (2008).  The *Avila* court's analysis indicates that Roman's bout with COVID-19 was not severe enough to qualify as a disability.  Avila was hospitalized for three days and returned to work a few days later with no restrictions.  *Id.* at 1249.  According to the court, these facts were consistent with a no-disability condition.  *Id*.  Roman's negative COVID-19 test less than two weeks later indicated that she was no longer infected with of COVID-19.  Roman did not tell Hertz that she had any lingering restrictions on her ability to work.  In other words, Roman's brief absence from work and later ability to return to work with no restrictions, similarly suggests her particular COVID-19 infection did not qualify as a FEHA disability.

*Cenis v. Winco Holdings, Inc*., (No. 1:17-cv-00863-DAD-JLT, 2018 U.S. Dist. LEXIS 89301 (E.D. Cal. May 25, 2018)), also supports the conclusion that Roman's COVID-19 infection was mild and short enough to not qualify as a FEHA disability.  In

*Cenis,* a non-chronic temporary illness, *i.e.*, food poisoning, that had infected the employee once during her employment, was deemed insufficient in "limiting" her ability to work to qualify as a disability. *Id.* at 18. The court noted her ailment was one of the specific examples of conditions excluded from the definition of disability under Cal. Code. Regs. tit. 2, § 11065(d)(9)(B), namely "non-chronic gastrointestinal disorders." *Id*. at 15. The court justified its decision by noting that food poising is a common ailment that will at one point "temporarily affect nearly all individuals." *Id*. at 18. COVID-19, like the food poisoning in *Cenis*, is a virus that may well "temporarily affect nearly all individuals."[9]

Lastly, Roman points to *Diaz* to argue that summary judgment on the question is impermissible. *See* Opp'n. at 7:6-7. While the matter of whether a plaintiff has a disability under FEHA is a question of fact, the court in *Diaz* stated that a genuine issue existed. The plaintiff had offered evidence that would allow a "reasonable jury . . . to find that [p]laintiff's condition constituted a limitation on a major life activity." *Diaz*, 373 F. Supp. 2d at 1053. That is not the case here.

### d. ADA Interpretations

The California Legislature modeled FEHA after the ADA. *See Colmenares v. Braemar Country Club, Inc*., 29 Cal. 4th 1019, 1025 (2003). Because of the similarities California courts have looked to decisions and regulations interpreting the ADA to guide construction and application of the FEHA. *Diaz*, 373 F. Supp. 2d at 1053-54; *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1140 (9th Cir. 2001) (considering federal appellate court decisions applying the ADA in interpreting the FEHA's similar provisions).

---

[9] *See* Caldwell, Travis; Hanna, Jason; McPhillips, Deidre; Maxouris, Christina. CNN "The Highly Contagious Omicron Variant Will 'Find Just About Everybody' Fauci Says, But Unvaccinated People Will Still Fare Better." Jan. 12, 2022. https://www.cnn.com/2022/01/11/health/us-coronavirus-tuesday/index.html/.

"Federal courts around the country are grappling with whether COVID-19 constitutes a disability under the ADA." *Baum v. Dunmire Prop. Mgmt.*, Civil Action No. 21cv0964-CMA-NYW, 2022 U.S. Dist. LEXIS 54555, at *10 (D. Colo. Mar. 25, 2022) (collecting cases). "If acute, short-term COVID-19 is considered a disability, then millions of Americans would suddenly qualify as disabled under the ADA." *Id*. at *14. The federal courts mostly agree that a short-term COVID-19 infection does not qualify as an ADA disability. *See McCone v. Exela Techs., Inc.*, No. 6:21-cv-912-CEM-DCI, 2022 U.S. Dist. LEXIS 45734 at *9 (holding that mere infection with COVID-19 does not meet the ADA's definitions of disability); *c.f. Thompson v. City of Tualatin*, 2022 U.S. Dist. LEXIS 43889 at *6 (holding that because most COVID-19 cases last fewer than 20 days, merely being perceived as having COVID-19 does not qualify as a disability); *Payne v. Woods Servs.*, 520 F. Supp. 3d 670, 679 (E.D. Pa. 2021) (holding that a COVID-19 infection, without noting symptoms or limitations stemming from the infection, does not qualify as an impairment under the ADA); *Matias v. Terrapin House, Inc.*, No. 5:21-cv-02288, 2021 U.S. Dist. LEXIS 176094 at *11 (E.D. Pa. Sep. 16, 2021) (holding that certain forms of COVID-19 that carry longer-term impairment of major life functions *can* qualify as a disability).

In the same way, Roman's bout with COVID-19 probably fails to qualify as a disability under the ADA applying ADA guidance. The ADA provision defining and prohibiting disability-based discrimination is strikingly similar to FEHA provisions. The disability-related provisions in the ADA and the FEHA are similar in that the two prohibit discrimination based on a disability for hiring or discharging employees. *See* Cal. Gov. Code § 12940(a); 42 USCS § 12112(a). The ADA and FEHA disability provisions are different in that ADA sets a higher threshold for disability by requiring that an impairment "substantially" limit a major life activity. *See* 42 U.S.C. § 12102(1)(A). In other ways, the two disability provisions significantly resemble each other. Both include in their definitions of disability the impact a condition has on bodily "systems" or "functions," with both listing neurological, respiratory, lymphatic, digestive

and endocrine systems. Cal. Gov. Code § 12926(m)(1)(A); 42 USCS § 12102(2)(B). Additionally, both require the disability assessment be made without regard to mitigating measures, such as medications, prosthetics, assistive devices or reasonable accommodations. Cal. Gov. Code § 12926(m)(1)(B)(i); 42 U.S.C. § 12102(4)(E)(i), (E)(i)(I-III).

The EEOC's non-binding guidance and technical assistance manuals in interpreting the ADA also suggest that run of the mill COVID-19 infections do not qualify as ADA disabilities. *Cf. Young v. UPS*, 575 U.S. 206, 224 (2015) (considering EEOC guidance in interpreting the ADA). In light of the COVID-19 pandemic, the EEOC recently clarified that an individual infected with COVID-19 who has "mild symptoms similar to the common cold or flu that resolve in a matter of weeks with no other consequences . . . will not be substantially limited in a major life activity for purposes of the ADA." *What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws,* U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/wysk/what-you-should-know-about-COVID-19-and-ada-rehabilitation-act-and-other-eeo-laws/ (last updated March 14, 2022). The EEOC further states that if this type of infection forces an individual to isolate according to CDC guidelines, the infection is not considered a disability. *Id*. Roman's experience while suffering from COVID-19 matches the description provided by the EEOC as the type of COVID-19 infection that fails to qualify as an ADA disability.

### 2. Whether an Employer's Treatment of COVID-19 Can Qualify an Individual as Disabled

Roman's implied, alternative argument is that Hertz's COVID-19 policy prevented her from working and therefore transformed her COVID-19 infection into a disability. Opp'n. 7:4-5. However, an employer's legal treatment of an individual cannot form the basis of finding for a disability.

The statutory language of FEHA reveals that a condition cannot qualify as a disability unless the condition itself reduces the body's physical or mental capacity to

perform activities.  FEHA defines the term "disability" as including having any "physiological disease, disorder, condition, cosmetic disfigurement or anatomical loss that *does* both of the following: (A) Affects one or more of the following body systems…[and] (B) limits a major life activity.  Cal. Gov. Code § 12926 (m)(1)(A-B) (emphasis added).  Because the array of bodily conditions is listed immediately before the active verb "does," the statute requires that the bodily condition itself impact an individual's bodily systems to the extent that it limits activity.  *See Klein v. United States of America*, 50 Cal. 4th 68, 77 (2010) (noting that California courts first look to the words of the statute in construing statutes because they are usually the most reliable indicator of legislative intent).  Additionally, an interpretation of the statute that would enable a condition to be disabling merely because of an employer's limitation on the person as a result of its treatment would render clause (A) of the statute superfluous.  *See id.* at 80 (noting that courts must strive to give meaning to every word in a statute and to avoid constructions that render words, phrases, or clauses superfluous).  Here, the statute specifically states, "[a] physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss limits a major life activity *if it makes* the achievement of the major life activity difficult."  Cal. Gov. Code § 12926(m)(1)(B)(ii) (emphasis added).

      Furthermore, the code's ensuing description of "limits a major life activity" further confirms the direct, active impairment of the bodily condition that qualifies as a "disability" under FEHA.  "Limits shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations . . . ."  *Id*.  None of the "mitigating measures" reference a third party's treatment of the person's condition.

      Here, Roman's positive COVID-19 test does not qualify as a disability under FEHA because the positive test did not make it physically difficult for her body to

perform the functions needed for her work.[10]  Here, Roman's limitation on working was not caused by her illness but by Hertz's COVID-19 policy.

Considering the preceding discussion, the Court finds there is no genuine dispute that Roman was not disabled under FEHA.

### B. Whether Roman Was Perceived or Regarded as Disabled

Roman asserts she was regarded or treated as having a disability precisely because of her COVID-19 diagnosis and her symptoms are a cognizable disability under FEHA. Opp'n. 8:1-4.  Alternatively, Roman argues that the company's policy that deems individuals unqualified for work because they have symptoms of COVID-19 is illegal per se. *Id*. at 8:7-11.  Hertz retorts that Roman was not discriminated against for being regarded as disabled because there is no evidence Hertz actually perceived Roman to be disabled as defined by FEHA.  Def.'s Mot. Summ. J. 12:4-5.

FEHA includes in its definition of physical disability "[b]eing regarded or treated by the employer as having, or having had, a disease . . . that has no present disabling effect but may become a physical disability." Cal. Gov. Code § 12926(m)(5).  To prove that an ailment may become a physical disability, evidence must be produced showing the employer acted in such a way to indicate that it believed an ailment to be potentially disabling. *See Ross v. County of Riverside*, 36 Cal. App. 5th 580, 595 (2019).  In *Ross*, the court found a genuine dispute on the question whether the plaintiff had a physical disability in part because his employer had forcibly transferred him to a different unit, requested medical information on his impairment, and placed him on paid leave pending a fitness-for-duty examination.  *Id*.

Here Hertz required a COVID-19 test from Roman before she was allowed to return to work, but this was required of all employees that answered "yes" to any of the COVID-19 screening questions.  S*ee* Pl.'s Ex. 10.  Hertz's actions stand in contrast to

---

[10] Plaintiff agrees in her Opposition that is undisputed that she "felt well enough to work," and that she did not believe anything was wrong with her aside from feeling tired.  *Id*. at 1:13-15.

the employer's action in *Ross* which were targeted specifically at the plaintiff. Additionally, unlike the employer in *Ross*, Hertz did not request any medical information from Roman that would have indicated a presence or absence of a potentially disabling effect from her COVID-19 infection. Importantly, there is little evidence. There is little evidence Hertz terminated Roman's employment because it regarded her disabled. While it is possible that was the case, the evidence is wholly inferential and amounts to no more than a scintilla. Therefore, there is no genuine dispute of material fact evidencing that Roman was regarded or perceived as disabled under FEHA.

### 3. Other Disability-based Discrimination Claims

Roman's first, second, third, fourth, and fifth claims for relief all require proof that she was disabled according to FEHA. *See* Cal. Gov. Code § 12940(a). Because there is no genuine dispute of material fact that Roman was not disabled as defined by FEHA, the Court grants summary judgment to Hertz on these claims. Moreover, Roman's claim for punitive damages is tied to these claims. Accordingly, the Court declines to address the merits of the parties' arguments on punitive damages as it finds the question moot.

### 4. Non-Disability Related Claims

Roman's two remaining claims relate to Hertz allegedly not providing her a timely final accounting and paycheck upon her termination. Hertz seeks summary judgment on these claims as well. Roman claims she was fired from her position on September 28th, but did not receive her final paycheck until September 29th. Pl.'s Dep. 12:15-17; 80:4-7. Under Cal. Lab. Code § 201, "immediate" payment of an employee's final paycheck is due upon termination.

In *Kao v. Holiday*, 219 Cal. Rptr. 3d 580 (Cal. Ct. App. 2017), the court found that delaying payment by five days to issue the terminated employee's last check in the course of the regular payroll process amounted to a violation of Section 201. There is no such delay here. Assuming Roman was fired on September 28th (and not the 29th as Hertz claims), at the latest, Roman received her final check within 24 hours of her termination. Here, Hertz sent the check via FedEx to Roman's house instead of waiting until the pay

period ended. The record indicates that while Roman may not have had her final check at the exact moment of termination, Hertz took immediate action to get her final pay processed and to her as quickly as possible and accomplished this within a day, including delivery time. Moreover, by Roman's own testimony, her final check was accompanied by a paystub that covered all wages due, as well as holiday and vacation pay due. Pl.'s Dep. 77:1-80:7.

Accordingly, the Court finds there to be no dispute of material fact relevant to Roman's wage claims. Hertz's motion for summary judgement on these claims is granted.

## V.   CONCLUSION

For the foregoing reasons, the Court grants summary judgment to Hertz on all claims.

**IT IS SO ORDERED.**

Dated: May 16, 2022

_____
HON. ROGER T. BENITEZ
United States District Judge